Good morning, Your Honors. My name is Lana Cecile Glenn, and I represent Mr. Baeza. Would you try to speak up, please? Excuse me. I'm Lana Cecile Glenn. I represent the appellant in this case, Mr. Baeza. As you know, by adopting and incorporating the opening and reply brief, we are asserting three errors in the conviction and sentencing of Mr. Baeza. And at the outset, I would like to address the issue of the denial of the defense counsel's motion for Frank's hearing. And I would refer you briefly to the excerpts of record filed with the appellant's opening brief, page 19, where the affiant submits his affidavit in support of probable cause. And at the end of page 19 in the final paragraph, he asserts that there were a total of approximately five buys for approximately one-eighth of an ounce each. And what this is saying to the judge in support of probable cause is that the informant, Mr. Roberts, had partaken in five controlled buys for one-eighth of an ounce each, which established that he was to be reliable in the subsequent searches, which procured a great more drugs. Secondly, if you look at the next page, the affiant in support of the probable cause issued a search warrant that resulted in the indictment and the convictions of Mr. Baeza. He notes that the confidential source, Mr. Roberts, had the following criminal history, which is one robbery charge in 1996 with no disposition, one felony charge in — and one felony charge drug-related in 1996, and that the confidential informant had been compensated. That is the extent of the information in the affidavit for probable cause. What reason did the district court give for not — I assume you asked for a Frank's hearing, right? Yes, Your Honor. Trial counsel asked for a Frank's hearing. What reason did the court give for not holding one? The court gave the reason that on the — looking at the four corners of the document, there was sufficient probable cause. The reason that the district court gave was that the facts were fully disclosed, had not misrepresented the facts, and had not omitted salient facts. What the misrepresentation is, number one, is the first thing that's read to you. You've never alleged any misrepresentation. Your Honor, we are alleging omission. Omission. Of truth. Because of the five buys, it wasn't one-eighth of an ounce each time. As a matter of fact, of the five buys, which is not disclosed in the affidavit, one was for $40, 2 grams, one was for $100, 1.1 gram, another one was $300 for 1.6 grams. There was no way that it was one-eighth of an ounce at each buy. It's an omission of fact. The other thing that was omitted is that the INIT, the Interagency Drug Enforcement Network out of Grant County, and the DEA both, were aware of the fact that the — Mr. Roberts, the C.I., was a drug user. There — it was undisclosed during the first five buys that he had, quote, And at one point, they found the drugs in the front part — compartment of an automobile, and he reluctantly admitted that he had pinched the drugs. The other thing that was not disclosed in the affidavit is the fact that INIT and DEA both had contracts with the informant. And the contracts basically read that if the informant engages in criminal behavior, or if he does any controlled buys or uncontrolled buys without the authority of INIT or the DEA, they will either be charged with a criminal action or their services will be terminated. That was not included in the affidavit that any of that occurred. He was caught, and he did not immediately say, I'm so honest, I here do this. There's contradictory evidence as to what his response was to that. The other thing that was not revealed in the affidavit, which leads up to the search warrant, is this man had a drug addiction. It's implied in the affidavit that he had a drug possession conviction in 1996, but there's no evidence in the affidavit that he was an ongoing drug user, including using drugs during performing his duties for the DEA and INIT. He had come forward voluntarily because he wanted to stop using drugs. Obviously, he was an addict, and he couldn't stop using drugs as he was pinching drugs during the operation. Finally, the other omitted facts, which I think are important, is there's reference to the compensation to this gentleman, as referenced above, and it just merely says in the affidavit he's compensated. It was not disclosed that overall he was compensated close to $6,000. He was compensated with the U-Haul. He was compensated with relocating. He was given money after each event. And he was even promised the purchase of a car that he made from the alleged defendant, Mr. Baza, from which he had not received title, that the DEA would assist him in getting title of the car. None of these facts were set forth. The judge finding probable cause was misled. I think they're material facts, and they go to the very issue of the credibility of the informant. Now, looking at the second issue, we are arguing that although trial counsel didn't request it, given the facts before the fact finder, that there should have been the model instruction out of the Ninth Circuit allowing the fact finder to assess the credibility and scrutinize the credibility with a proper jury instruction, I believe it's Ninth Circuit criminal jury instruction 4.10.1, cited to in my brief, opening brief, page 32. We review for plain error of that, don't we? Yes, Your Honor. And in that event, the error has to be not raised at trial. It has to be error, it has to be very plain, and it has to affect substantial rights. And what we are arguing is that Mr. Baza's rights were substantially affected and that he was denied a fair trial where the fact finder, the jury, was not given the proper instruction. The jury was only given the general felony instruction, but they were not given the instruction that included the facts of compensation to the witness or how the witness, Mr. Roberts, may have been impacted in his testimony by promises or receipt of benefits. And that is a proper jury instruction to allow a jury to make a finding that can stand up under the due process clause. In fact, what the jury should have been instructed, according to the commentary of the pattern instruction, they were entitled to this instruction when the witness had gathered information which he had as an undercover, in an undercover capacity for the government or has been paid, given promises, or advantageous treatment or has received other benefits for that information. Mr. Roberts received the benefits of no criminal charges when he had pinched drugs. He received the benefit of continuing employment when he received, when he operated for the DEA. He received a great deal of compensation. And the jury was not allowed to assess his credibility given that circumstance for lack of giving the proper instruction. I would like to call attention to one thing, and I'm not going to address the third argument except stand on the brief, and that is I would refer Your Honors to the case cited by the government, and that is U.S. Reeves, U.S. v. Reeves. It's a 2000 case, and there is a commentary or some information in that case distinguishing U.S. Reeves from U.S. Reeves. And I would like to call attention to the third argument, and that is U.S. Reeves and Maling and Hall. And the very bottom line out of that case, going back to the first issue, is courts deserve and should have all available relevant information to aid them in the determination of probable cause. And I think that that case may be dispositive of this one. Do you have any questions? May I reserve? Yes. Thank you. Thank you. Good morning, Your Honors. My name is Tim Ohms, appearing on behalf of the government. Your Honor, the defendant's case on issues one and two, the first two issues, the only issues she addressed this morning in an argument, depends upon a certain characterization of the evidence. And the defendant makes certain characterizations of the evidence. The defense counsel makes those in her brief, and she made them again this morning. In her brief, she says, here in this case, Mr. Roberts' testimony supplied the only strong evidence in support of Mr. Baez's guilt. That's the claim. That's at her brief at page 34. Why does she make that claim? She makes that claim because the legal standard that she's appealing on requires that. She's claiming error from a jury instruction that was not given and that was not requested. And the commentary underneath that instruction doesn't require the court to give it. It says the court may not deny a request for such instruction when it's supported by appropriate evidence. And the commentary goes on to say, hence, the same rule should apply to this instruction, that the court need not give it sua sponte except in the exceptional case where the testimony is almost entirely uncorroborated. So that's the nature of the claim that the defendant is making in this case, that this is that kind of exceptional case where the testimony of the cooperating witness is almost entirely uncorroborated. Okay. That's the first category of claim. There's a second category that really is specific to the Franks issue and it has to do with the informant's background. And these claims are essentially that he, Mr. Roberts, was a drug user, abuser, and had used methamphetamine  Another claim, the CI was using drugs during an active investigation and was attempting to hide drugs during a buy. And finally, Mr. Roberts testified that he informed INET that after signing the agreement, he used a controlled substance once at a friend's house. And those are the claims. Those are specific to the Franks issue. And I want to come back and look at those claims in some detail from the record. The government's position is the defense characterization of this case mischaracterizes the case. It mischaracterizes the evidence. And even these statements about the defendant mischaracterize the evidence as to this defendant. All right. What does the defense omit? The defense omits certain information from the opening brief. It doesn't appear anywhere in a factual statement and it doesn't appear in the facts. What are those, what is that information? That each of the Federal buys, one, two, and three, three Federal buys, included some audio recording. In fact, buy one and buy three were completely recorded. So there's an audio recording of those that fully corroborates the informant. The, and that's not in the defendant's brief. So according to the defendant, that's not considered strong evidence of the defendant's guilt. There was aerial surveillance conducted of buys two and three, the last two Federal buys. Why was there aerial surveillance conducted? Because during the surveillance of the first Federal buy, the Federal agents learned that no matter how close they got to the orchard, they couldn't get close enough to actually see what was going on, where the meetings were occurring. What they saw was the informant driving down to the defendant's residence on the orchard. But they weren't able to see beyond that. So they got an aircraft and the next two buys were surveilled. There was surveillance and there was video. There was videotape of everything that happened, all of the actions that occurred out in the open, where people went, fully corroborative of the informant. And that includes the defendant going to the defendant's residence during each buy, which was fully consistent with the defendant going there to get drugs. In fact, he … They videotaped from the airplane. Is that what they did? Yes. They videotaped activities out in the field area? Yes, Your Honor. And so what would happen, for instance, was on the last buy, which there was a lot of activity outside, the informant goes to this workshop. And this is an orchard, but this is not orchard season. Okay? There may be another person here or there, but basically the activity is occurring around the shop. The defendant is there because the defendant lives there and he manages the water system for the orchard. So the aircraft was able to videotape this person coming out, later identified as the defendant, wearing the same clothing, essentially the same light vest jacket that the defendant was later arrested wearing, and driving the AT vehicle around to the wrecked cars where marijuana was later discovered. Going back, the informant then says, no, I don't want marijuana, I want the methamphetamine. And then he goes to the pump house, consistent with picking up the methamphetamine, goes to his residence, consistent with weighing it out, goes back to the junk car, because in the meantime the informant had said, well, maybe I'll take a front of the marijuana, and then goes back to the shed. Now, who is that person who's doing that? Well, when the informant gets into the machine shop, there's only two people there. There's one guy working on a golf cart. You can actually hear him working on the golf cart, and he's changing the oil. And at some point in time, he's confused about how much oil to put in the vehicle. And the informant tells him, why don't you just wait until Rigo gets back? Rigo is the name of the defendant. Rigo Bertovaeza had used the name Rigo, and that was confirmed by endless testimony. So I'm addressing your question about the video. The video is limited because you're only seeing what's occurring outside, but it fully corroborates the informant. What else does the defense not mention in their brief, not mention in their argument? By two began with a phone call to the defendant's cell phone, a conversation with the defendant in which the defendant says he's got four pink ladies. That's what the discussion is about, a transaction involving four pink ladies. That's the transaction. Then that's the phone call that leads to the buy of four ounces of methamphetamine. So corroborating again the informant, that was a tape-recorded phone call that the jury had an opportunity to hear and assess. What else does the defense leave out? The defense doesn't mention anywhere in their brief the name Darren Smith. Who's he? He's the person who came in and said, I've known the defendant for 20 years, and that sounds like him on the tape engaging in these drug deals with this cooperating witness. What else does Darren Smith do? Well, what's your point on this? So there's all this corroborating testimony. What does that mean? Is the rule that if the informant's information is corroborated, that negates the need for frank suing? Is that your point? No, Your Honor, I'm sorry. I'm arguing the general proposition by the defense right now, that the case itself was only based upon the strong evidence. The only strong evidence in the case was the cooperating witness' testimony. And that goes to the, what, the jury instruction plain error? It goes to the jury instruction plain error. It also relates to the Franks issue because some of this information has to do with surveillance that was conducted, that was incorporated into the affidavit by the Federal agent, which is one of the reasons why when the district court judge looked at this, the district court judge said, look, there's overwhelming evidence of probable cause here. I mean, you know, there's no question that there were drug buys occurring at this orchard in relation to this residence and that a search warrant should issue based upon probable cause. You mean there's enough other facts to support probable cause even if you ignore the challenged testimony because of the Franks issue? That's correct, Your Honor. And I'd like to move on because I want to get to the specific point that I think goes back to the Franks issue. But I want to cover a couple of additional points because, again, these are things that should have been in the defense brief that aren't there. Darren Smith not only testifies that that sounds like the defendant's voice on the tape, but he also identifies specific statements made by the person clearly participating in the drug deal, because you can hear methamphetamine actually hitting the scales on that tape. There's a reference to the drug dealer's brother working at Western and in the transcript it says Western Aero. Darren Smith says, no, actually the defendant has a brother who works at Western Auto. The drug dealer says his brother has bought his Camaro from him. Darren Smith is a law enforcement officer and said, I've stopped his brother in that Camaro when he was speeding. There were other specific references to automobiles that clearly identify the defendant, including not just the Camaro, but a Firebird, a Harley Davidson, a Bronco. And then there was a statement where the drug dealer says he's got to go check the sprinklers, which was, in fact, the defendant's job at the orchard. Let me move on then. The defense brief doesn't mention Greg Olson. And who's that? Greg Olson, the defense says, well, there were other people around at these drug deals. Well, in the second drug deal, another person does show up, and there's another person in the car with him. It's actually Greg Olson's wife. The government found out who that person was. It was Greg Olson. The government subpoenaed that individual, called him as a witness, and Greg Olson said, yeah, I was there to get methamphetamine from the defendant. And, by the way, there was a guy named Sam there. Well, actually, he wasn't talking about he couldn't be specific about that day. But he said, I've been there with a guy named Sam, Sam Roberts, and the defendant also was supplying him with methamphetamine. So that seems like strong evidence of guilt. And then, finally, the defense doesn't even discuss what was found during the search of the defendant's residence, the fact that there was marijuana in his bedroom, in the kitchen. There was some methamphetamine found. There were two scales found, neither one of which is consistent with dieting. One of them uses the weights, and the other one is a digital scale. There was marijuana found out in the wrecked vehicles as well. Okay, so let me – you've heard how the defense characterizes the evidence now. Let me mention how the defense, the trial attorney, the trial defense attorney, characterized this evidence as sentencing, because he was explaining his defendant's failure to appear. He said he, granted, he, the defendant, was scared after seeing the voluminous amount of evidence that was presented against him. I don't think he had a real grasp of what the government's resources were and what they had against him. And then, sitting in court, he not only saw a video, he – and this is a misstatement – he saw audio. I mean, there could not have been much more evidence they could have brought in, and I think he was scared. This was at the what hearing? This is at the sentencing hearing. This is the defense attorney's characterization of the government's case. The defense attorney's not saying, oh, well, this is a case where the only strong evidence was the cooperating witness. The defense attorney's saying, look, my client was scared out of his mind because he got in here and he saw that video. He saw himself on it. He heard himself on the tapes, and he heard the cooperating evidence. Let me move on, then, to the Franks issue because these are the specific statements made that the defendant was a drug user, and then there's a specific statement here that the defendant had used methamphetamine. Later, the defense says, well, he used a controlled substance. I have looked for the references to that. The first place the defense cites is Excerpt of Record, I believe, 29 through 32, which is sentencing argument. That doesn't support the defendant's assertion there. The only place I found reference to the assertion that the defendant actually used a controlled substance after he stopped, he was a person who had been a drug addict. He got off drugs. He moved back to the Pasco area and started using drugs again based upon his relationship with the defendant. Then his life sort of came apart. His wife left him. He decided to stop, and he went and contacted police at that point. Here's the only statement about his drug use since his stopping. And this is on – this isn't on cross. This is on direct examination. At any point in time after you signed that agreement, did you also use a controlled substance? His answer, yes, at one time I did, and I let them know I did. And where did that occur? I was staying at a friend's shop. Now, that's as much of the record as the defense includes in her excerpts, or as the defense counsel includes in her excerpts. Here's the next page. Actually, I've got to turn to the transcript to get the next page because the next page is not in – as I mentioned, not in the – here's the next page. What kind of controlled substance was it? Answer, marijuana. Question, where did you get that? Answer, Rego. And you go on to find out that that occurred on that fifth state buy. So this statement that he's an ongoing drug user and implicitly, if not explicitly, saying that he was using methamphetamine isn't supported by the record. In fact, what it's consistent with is a one-time lapse. That is, on that fifth buy, he went back, the defendant offered him some marijuana, and let's face it, this is not something that somebody's prone to just because they've used drugs before. There's a lot of pressure on a person who knows somebody personally and wants everything to appear normal. And that – and the drug dealer says, here, have a puff of this marijuana. If that person refuses that, they're going to look like something very unusual is happening. That's the context of all this. And then after he has that, what does he do later as he's going out to meet the officers? He takes the methamphetamine, tries to conceal it. It doesn't work. They find it when they search his vehicle, as they should. They confront him with it. He says, yeah, I really screwed up. I'm sorry about that. Now, in retrospect, should that have been disclosed in the search warrant affidavit? Sure, it should have. And that's always the case on these Franks issues. You always wish that you could have included that and would have either had notice of it or specifically provided it. And the agent did have notice of that, so he should have provided that. But what's the context of all this? When you look at this search warrant affidavit, I mean, when you read the defense brief, you would get the impression that only two people testified in the entire trial, the first witness for the first State agent and the cooperating witness, Sam Roberts. And you would get the impression that this whole probable cause was based upon these State searches. The complete statement about the State searches is just simply that this case was referred to the DEA based upon a report by the State that they had gone out and done these buys. It's basically just context. That's not why the Federal agent was asking the Court to grant permission to search. That request was being made based upon these detailed accounts of the next three buys. And those three buys, Your Honors, is part of the reason why I had that broader discussion about the evidence that was left out by the defense as it related to those. Because there is probable cause based upon those three buys, and the district court judge evaluated that and exercised his discretion and just basically said, come on, this isn't – this – there's clearly probable cause to go search the residents on this orchard because drug deals were occurring there. There were omissions in this case, Your Honor, but the most profound omissions in this case occurred in the defense memorandum to the Court. And when this case is viewed in context, full context of the record, there was overwhelming evidence the case was not wholly dependent upon the testimony of the cooperating witness, and there was clearly a basis for the Court to determine that there was no need for a Frank's hearing in this case. Thank you, Your Honors. Thank you. Thank you. Thank you. Ms. Bubba. Your Honors, I would just like you to take notice that the appellate in the opening brief is the party that submitted the entire document of the affidavit in support of probable cause. There is nothing that Mr. Bays's counsel or trial counsel was trying to hide. And, in fact, the other thing I would like to just distinguish from Mr. Ohm's characterization is, if you look in the excerpts of record, which is the testimony during the trial at excerpt 51 and 52, Detective Recktenwald admits that if he had known that if a C.I. was using he says it right out. And one of the other things, and I'm sure maybe you followed a little more clearly than I did, but I think that Mr. Ohm's is having you look, when he says by 1, by 2, and by 3, he's talking about April 17th and the two bys in May. What I'm talking about are the five previous bys that are not adequately described or characterized appropriately for the court that made the finding of probable cause. And we are not arguing that there wasn't any uncorroborated evidence to what is in the affidavit if there was surveillance. But I would also point out that in the, along with the surveillance, the affidavit does say that they lose sight during the surveillance of what Mr. Ohm's characterizes as the first by, which is the 4-17-2001 by. They lose sight of Mr. Beza for about 31 minutes. That's a half an hour. He's out of view. There are other persons, and they can't think. Nobody actually sees. Mr. Roberts retrieved the drugs from Mr. Beza. There are sheds. There are cars. There are other people roaming around. And a great deal of the evidence that Mr. Ohm's would have you characterize as corroborating is evidence, once again, out of the mouth of Mr. Roberts and what transpired while he was there. And one final thing, too, that I would like to point out is during the first five bys, which is the basic premise under which we are saying that the Court wasn't given sufficient material facts to make a legitimate finding of probable cause because of omissions, is during those first five bys, they were a quarter of a mile away. And I think that's a very salient and critical fact in terms of how much evidence they really had in terms of Mr. Beza's direct involvement. And finally, unless you have any other questions, the evidence at trial has nothing to do with my argument as to the sufficiency of the affidavit in the finding of probable cause. The evidence at trial does have a great deal to do with whether the proper instruction was given for a fair trial for Mr. Beza. Do you have any other questions? Thank you. All right. Thank you. Thank both counsel. This case is now submitted for decision.
judges: Reavley , Tashima, Paez